# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 25-233V**
**Filed: October 27, 2026**

| | |
|---|---|
| KATIE DIENBERG, *on behalf of L.D.*,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Mark Theodore Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner.*
*Michael Bliley, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDING OF FACT[1]

On February 10, 2025, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that L.D. suffered diffuse alopecia areata caused-in-fact by her February 11, 2022 Human Papillomavirus ("HPV") vaccination and/or influenza vaccine. (ECF No. 1.) On June 2, 2026, I issued an order to show cause, instructing petitioner to demonstrate that L.D.'s injury satisfies the Vaccine Act's so called severity requirement, as discussed further below. (ECF No. 24.) For the reasons set forth herein, I conclude that petitioner has demonstrated by a preponderance of the evidence that L.D.'s condition persisted and/or recurred for longer than six months, thereby satisfying the statutory severity requirement.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I. Procedural History

Petitioner initially filed medical records, a PAR questionnaire, and a written statement, marked as Exhibits 1-4, followed by a Statement of Completion. (ECF Nos. 6, 9, 15-16.) Thereafter, the case was assigned to the undersigned in January of 2026. (ECF Nos. 17-18.) Respondent then filed his Rule 4(c) Report on June 1, 2026. (ECF No. 23.) Respondent recommended against compensation, raising in pertinent part the issue of whether petitioner had satisfied the Vaccine Act's severity requirement. (*Id*. at 5-6.) I then issued an order to show cause, directing petitioner to demonstrate why the case meets that requirement. (ECF No. 24.) I permitted petitioner to file additional evidence and directed her to file a legal brief supporting her position. (*Id*. at 3.) I advised that I would then permit respondent the opportunity to file a written reply before "issuing either a dismissal decision or a finding of fact that petitioner has satisfied the severity requirement." (*Id*.)

In response to the order to show cause, petitioner filed additional medical records marked as Exhibit 5, a photograph from Snapchat marked as Exhibit 6, and a brief. (ECF Nos. 25, 27-28.) Respondent then filed his reply. (ECF No. 29.) In his reply, respondent argued that the date of the photograph at Exhibit 6 was not established. (*Id.* at 4, 8.) Petitioner then filed an additional written statement marked as Exhibit 7. (ECF No. 30.) Respondent was given the opportunity to indicate whether additional filings were necessary. (Non-PDF Scheduling Order, filed Oct. 9, 2026.) In a status report filed October 16, 2026, respondent maintained the view that the photograph was not adequately authenticated but did not request further proceedings or evidence. (ECF No. 31.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record on this issue and that it is appropriate to resolve the severity requirement issue raised by respondent on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

## II. Summary of Record Evidence

L.D. received the vaccination(s) at issue on February 11, 2022, at twelve years of age. (Ex. 1, pp. 4, 6-7.) About two months later, on April 18, 2022, L.D. presented to her primary care provider with a two-week history of hair loss in "globs" for which she was referred to a dermatologist. (*Id.* at 1-2.) She then presented to the dermatologist on May 9, 2022. (Ex. 2, p. 13.) Petitioner reported that L.D. had lost about 70% of her hair one month ago but indicated the thinning had slowed. (*Id*. at 15.) As of this encounter, the dermatologist assessed about 50% hair loss, observing diffuse areas of hair loss on the entire scalp as well as "short, broken 'exclamation mark' and depigmented hairs" and "tapered broken hairs on hair pull." (*Id*.) L.D. was diagnosed

with diffuse alopecia areata and seborrheic dermatitis. (*Id*. at 14.) She was prescribed Clobetasol[3] and directed to follow up in six weeks. (*Id*. at 16.)

L.D. returned to the dermatologist on July 13, 2022. (Ex. 2, p. 2.) She reported being uncertain whether the Clobetasol treatment was working, noting she continued to feel as though she was losing hair when brushing or showering. (*Id*.) The dermatologist again observed diffuse hair loss throughout the scalp and noted that a pull test demonstrated "tapering of the hair to a white hair at the bulb." (*Id*.) The dermatologist recommended that L.D. continue with Clobetasol and also recommended a JAK inhibitor.[4] (*Id*.) She was directed to follow up again in six weeks. (*Id*.) However, L.D. did not return for follow-up.

In a written statement, petitioner indicated that she initially attempted to make a follow-up appointment with the dermatologist but did not end up doing so due to L.D.'s schedule. (Ex. 4, ¶ 11.) She explained that "[a] couple months later, around the fall, her hair was starting to grow back in the spots where she had gone bald. She was on no medication, and it happened naturally." (*Id.* at ¶ 10.) "Ever since her hair began to come back, we decided to stop medical appointments as we deemed it unnecessary." (*Id*. at ¶ 11.) Petitioner separately submitted a photograph of L.D. that shows a single small patch of hair loss. (Ex. 6.) The image reflects that it was sent via Snapchat on February 25, 2024. (*Id*.) However, petitioner also confirmed in a separate written statement that the photograph was taken on the date the message was sent. (Ex. 7.) As of December 10, 2025, the date her initial written statement was signed, petitioner states that "[n]ow, [L.D.]'s hair is completely thick and way healthier than before." (Ex. 4, ¶ 13.) However, at a well child encounter of December 15, 2025, L.D.'s primary care provider documented as part of the physical exam that L.D. had a "few areas of thinning hair." (Ex. 5, p. 15.) (Other records in the interim are silent with regard to either the history of alopecia or the state of L.D.'s hair.)

---

[3] Clobetasol propionate is an analogue of prednisolone and a very high-potency synthetic corticosteroid used topically to suppress inflammation and itchiness in corticosteroid-responsive dermatoses. *Clobetasol propionate*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=10122 (last visited Oct. 23, 2026).

[4] Janus kinase ("JAK") is "a family of non-specific protein-tyrosine kinases," which are "activated by binding of cytokines to their plasma membrane receptors; the kinases, bound to the cytoplasmic domains of the receptors, serve as intermediates linking the receptors to activation of the STAT [i.e. signal transducer and activator of transcription] family of transcription factors, which migrate to the nucleus to regulate gene expression." JAK is involved in signaling pathways critical to cell growth, differentiation, and adhesion, in lymphocyte activation, and oncogenesis. JAK inhibitors are immunomodulatory medications that specifically target and inhibit JAK. *Inhibitor*, DORLAND'S MEDICAL DICTIONARY ONLINE, *JAK*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=26522 (last visited Oct. 27, 2026); *Janus kinase*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=26536 (last visited Oct. 27, 2026); *Non-specific protein-tyrosine kinase*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=34255 (last visited Oct. 27, 2026).

## III. Legal Standard

In order to state a claim for a vaccine-related injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§ 300aa-11(c)(1)(D). In this case, only the first of these conditions is potentially met.

Neither "residual effects" nor "complication" is defined within the Vaccine Act itself. *See* § 300aa-33. However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury. An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness." 22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted). A "complication," however, is "[a] morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it." *Id.* at 1006 (alteration in original) (citation omitted). "Read together, 'residual effects' and 'complications' appear to both refer to conditions within the patient, with 'residual effects' focused on lingering signs, symptoms, or sequalae characteristic of the course of the original vaccine injury, and 'complications' encompassing conditions that may not be 'essential part[s] of the disease' or may be outside the ordinary progression of the vaccine injury." *Id.* (alteration in original).

Because the complication or residual effect must be "of such illness, disability, injury, or condition," the traditional tort concepts of causation apply, and the vaccine injury must be both a but-for cause and substantial contributing factor to the complication or residual effects at issue. *Wright*, 22 F.4th at 1004-05. The Vaccine Act prohibits a special master from ruling for petitioner based solely on his allegations unsubstantiated by medical records or medical opinion. § 300aa-13(a)(1). However, "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case,'" whether causation has been demonstrated. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)). Special masters are not bound by the reports, summaries, or conclusions contained in the medical records. § 300aa-13(b)(1). Rather, the special master must consider the entire record. *Id*.

A petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim. *See* § 300aa-13(a)(1)(A). However, not every element of petitioner's claim needs to be specifically supported by medical records or opinion. For example, onset of an injury may be determined to be consistent with the

Vaccine Injury Table even when the first symptom or manifestation "was not recorded or was incorrectly recorded as having occurred outside such period." § 300aa-13(b)(2). The fact of a vaccination also need not itself be proven by medical records or medical opinion. *See, e.g.*, *Wonish v. Sec'y of Health & Human Servs*., No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991) (stating, with regard to § 300aa-13(a)(1), that "[i]t seems obvious then that not all elements must be established by medical evidence" and that "[v]accination is an event that in ordinary litigation could be established by lay testimony" as "[m]edical expertise is not typically required"); *Centmehaiey v. Sec'y of Health & Human Servs*., 32 Fed. Cl. 612, 621 (1995) (noting that the "lack of contemporaneous, documentary proof of a vaccination, however, does not necessarily bar recovery"), *aff'd*, 73 F.3d 381 (Fed. Cir. 1995). The Federal Circuit has also observed, albeit in the context of attorneys' fees and costs, that "[w]hile lay opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms." *James-Cornelius v. Sec'y of Health & Human Servs*., 984 F.3d 1374, 1380 (Fed. Cir. 2021).

However, medical records do ordinarily "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records. *See, e.g.*, *Reusser v. Sec'y of Health & Human Servs.,* 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Vergara v. Sec'y of Health & Human Servs*., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a comprehensive evaluation of the entire record. *Shapiro v. Sec'y of Health & Human Servs*., 101 Fed. Cl. 532, 539-41 (2011). "[M]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). Moreover, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) (explaining that, "like any norm based upon common sense and experience, this rule should not be

treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy*, 23 Cl. Ct. at 733)). However, when witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence." 997 F.3d 1378, 1381 (Fed. Cir. 2021). In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free. *Id.* at 1379-80. Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period. *Id.* at 1380. However, petitioner testified that she continued a home exercise plan for more than a year. *Id.* at 1381. Her testimony was corroborated by documentation in the form of her retained home exercise instruction sheets, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury. *Id*. The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement. *Id*. at 1383-84.

## IV. Party Contentions

Respondent initially raised the issue of whether petitioner met the statutory severity requirement in his Rule 4(c) Report, prompting the undersigned's order to show cause. (ECF No. 23, pp. 5-6.) Respondent stressed that L.D.'s last medical encounter for her alopecia was July 13, 2022, which is less than six months from the onset of her alopecia. (*Id.* at 6.) He argued that only petitioner's testimony that the condition resolved "around the fall" places the resolution of symptoms after the six-month mark, which he implicitly contends is inadequate. (*Id.*)

In response to the order to show cause, petitioner filed updated medical records at Exhibit 5 and the above-discussed Snapchat photograph at Exhibit 6. (ECF Nos. 25, 27.) She argued that her testimony that hair regrowth occurred "around the fall" should be credited as corroborated testimony in connection with the photograph of February 25, 2024. (ECF No. 28, pp. 3-6.) Petitioner also stressed that L.D. was still symptomatic when she was last seen on July 13, 2022, and that the treating physician at that time anticipated that her condition would continue for another six weeks, which is

beyond the six-month threshold.[5] (*Id*. at 2-3.) Moreover, petitioner suggested that she is not obligated to demonstrate continuous treatment for six months. (*Id*. at 4.) Petitioner argued that the same reasoning as applied in the Federal Circuit decision in *Kirby* supports petitioner's contentions in this case, contending that petitioner's testimony is corroborated and the medical records are silent rather than contradictory. (*Id*. at 4-5.)

In reply, respondent argued that L.D.'s symptoms more likely than not resolved less than six months after onset. (ECF No. 29, p. 5.) He reiterated that the July 13, 2022 encounter was the last treatment record and suggested that the fact that L.D. did not follow up in August of 2022 is an indication that her condition resolved. (*Id.* at 5-6.) Respondent does not necessarily agree that the medical record establishes any expectation that the condition was expected to persist for six more weeks, but in any event, a mere expectation that L.D.'s condition would persist does not satisfy the statutory requirement. (*Id*.) Respondent argued that petitioner's written statement regarding ongoing symptoms into the fall is vague and not credible. (*Id*. at 6.) Respondent contended that *Kirby* is distinguishable from the instant case, because the *Kirby* petitioner was discharged from care for her injury whereas this petitioner was expected to follow up but did not. (*Id.* at 6-7.) Moreover, respondent found petitioner's purported corroborating evidence to be insufficient, especially given respondent's expectation that more such evidence should exist if petitioner's allegations were credible. (*Id*. at 7-8.) Respondent explained:

> [P]etitioner has provided no evidence of any kind depicting L.D.'s hair loss between July 13, 2022, and February 25, 2024. Response at 4. Petitioner's ability to produce only one photograph, purportedly from February 25, 2024, over nineteen months after her last medical appointment, underscores the weakness of her argument on severity. Respondent emphasizes that numerous photographs of L.D.'s alleged hair loss would likely exist, including during the period "around the fall [of 2022]," if she had still been

[5] The Vaccine Act's severity requirement requires in pertinent part that the vaccinee suffer complications or residual effects of the alleged injury for "more than 6 months after the administration of the vaccine." § 300aa-11(c)(1)(D). The order to show cause issued in this case initially contemplated that petitioner would need to demonstrate that her condition persisted for at least six months from the time of the vaccination at issue. (ECF No. 24, p. 2 (noting that the follow-up appointment anticipated after L.D.'s July 13, 2022 encounter would be beyond the six-month mark).) This is consistent with how some special masters have interpreted the Vaccine Act. *E.g.*, *Herren v. Sec'y of Health & Human Servs*., No. 13-1000V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014). Thus, in her show cause response, petitioner stated that the key question is whether L.D.'s symptoms persisted beyond August 11, 2022. (ECF No. 28, p. 2.) However, other special masters have interpreted the severity requirement as requiring six months of sequela from the date of onset. *E.g.*, *Lambert v. Sec'y of Health & Human Servs.*, No. 21-1275V, 2025 WL 1078788, at *5 n.4 (Fed. Cl. Spec Mstr. Mar. 10, 2025). Thus, in both his Rule 4(c) Report and his reply to petitioner's show cause response, respondent discussed the duration of L.D.'s symptoms from the time of onset to the time of resolution, seemingly to suggest that symptoms needed to have persisted until early October to meet the severity requirement. (ECF No. 23, p. 6; ECF No. 29, p. 5.) Although this poses a potentially significant legal question, it is ultimately unnecessary to resolve that question in light of the facts and circumstances of this case as well as the analysis that follows.

> suffering from alopecia. Ex. 4 at 2; *see* Response at 8. The absence of evidence speaks for itself.

(ECF No. 31, p. 2 (alteration in original).) Respondent also argued that the photograph at Exhibit 6 should be given little weight, because it is authenticated by petitioner's "word alone" rather than by any objective evidence. (*Id*. (citing *Christopher v. Sec'y of Health & Human Servs*., No. 18-1210V, 2020 WL 2466601, at *4 (Fed. Cl. Spec. Mstr. Apr. 8, 2020.).) Moreover, respondent contended that the photograph is inconsistent with petitioner's written statement, explaining that:

> Petitioner's affidavit, indicated that by the fall of 2022 L.D.'s hair "was starting to grow back in the spots where she had gone bald," and that later her hair was "completely thick and way healthier than before." Ex. 4 at 2. The affidavit did not describe a period in 2024 where L.D. showed continued or additional hair loss. It is reasonable to expect that if L.D.'s hair loss either lasted an additional nineteen months beyond fall 2022, or had seemingly resolved and then resurfaced at a later time, this would have been documented in the 2025 affidavit. This is yet another way in which the paucity of reliable evidence undercuts petitioner's case.

(*Id.* at 2-3.)

## V. Discussion

Although the last treatment record of July 13, 2022 memorializes an encounter that occurred less than six months from the date of vaccination and a little over three months from the onset of L.D.'s alopecia, it is important to note that this medical record confirms that L.D. was still significantly symptomatic at that time, having reported that she was still losing hair and her dermatologist having confirmed ongoing diffuse hair loss throughout the scalp. (Ex. 2, p. 2.) Moreover, continued treatment was recommended. (*Id.*) In fact, the addition of a new treatment (a JAK inhibitor) was contemplated. (*Id.*) While respondent is correct that the expectation that L.D.'s condition would continue is not enough standing alone to satisfy the severity requirement, it is relevant that her treating physician felt her condition was unresolved and likely to continue as of mid-July. That is, nothing about the July 13, 2022 encounter lends any support to the idea that L.D.'s condition was on the verge of resolution at that time. Moreover, given the condition at issue and the fact that L.D had a treatment plan in place, I do not find petitioner's written statement incredible in suggesting that follow-up was initially delayed and then fell by the wayside once L.D.'s hair later began to recover in the autumn. (Ex. 4, ¶ 11.) Although respondent expresses disbelief based on the fact that petitioner did not file more corroborating evidence, he has not actually pointed to any evidence of record that contradicts petitioner's recollection that L.D.'s symptoms lasted into the fall. Thus, without more, respondent is not persuasive in suggesting that L.D.'s failure to follow up in mid-August is dispositive of whether her condition was continuing at that point. On this record, no medical record confirms the resolution of L.D.'s alopecia.

Moreover, patches of thinning hair were again confirmed by L.D.'s primary care provider upon a much later physical exam in December of 2025. (Ex. 5, p. 15.) Respondent argues that without further explanation, it is not possible to know whether the reference to patches of thinning hair noted at the December 2025 encounter referred to something more recent or whether it referred historically to her 2022 hair loss. (ECF No. 29, p. 7 n.6.) However, I do not agree that the medical record is ambiguous as respondent suggests. Respondent quotes only the statement by the treating physician included within the guidance portion of the medical record. (*Id.* (quoting Ex. 5, p. 16).) He does not recognize that the provider also documented the thinning hair as part of the physical examination. (Ex. 5, p. 15.) Although statements by litigants recorded in later treatment records may be viewed skeptically when it appears they are primarily intended to bulwark a claim, *e.g.*, *Crittenden v. Sec'y of Health & Human Servs.*, No. 21-0215V, 2024 WL 5261958, at *9 (Fed. Cl. Spec. Mstr. Nov. 21, 2024), this skepticism is less readily applied to the direct observations of the treating provider, *e.g.*, *Rastetter v. Sec'y of Health & Human Servs.*, No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (declining to credit the litigant's reported history absent a bona fide treatment encounter but distinguishing the "direct observations and impressions" of the provider as "more valuable"). Accordingly, the December 2025 medical record is sufficient to document hair loss occurring at that time.

Respondent also argues that thinning hair noted in 2025 is "too far removed to be connected back to her 2022 alopecia." (ECF No. 29, p. 7 n.6.) However, this is not persuasive without more. Respondent has stressed that the December 2025 medical record provided no explanation for the hair loss. (*Id.*) However, he did acknowledge that L.D.'s history of alopecia was included as among the "concerns raised" at the encounter. (*Id.* at 4 (discussing Ex. 5, p. 14).) Moreover, L.D.'s prior alopecia diagnosis *can* explain her symptoms. Therefore, it would be odd to set aside that established diagnosis to speculate as to some other unknown cause of hair thinning in a 16-year-old. Prior cases in this program have explained that "[o]nce [alopecia areata] is triggered, its clinical course is variable and not monophasic in progression. Some patients experience recurring loss and regrowth, other patients experience one episode, and some will experience everything in between." *Cordova v. Sec'y of Health & Human Servs.*, No. 17-1282V, 2021 WL 3285367, at *15 (Fed. Cl. Spec. Mstr. June 23, 2021). Thus, the Court of Federal Claims has held that petitioners are not obligated to demonstrate causation for subsequent recurrences of alopecia, which is a chronic and often recurring condition. *DeLozier v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 558 (2021). Even if L.D.'s 2025 hair thinning represented a recurrence rather than a lingering of symptoms, the Federal Circuit has confirmed that residual effects can encompass recurrences. *Wright*, 22 F.4th at 1005-06.

And, finally, petitioner has presented a photograph showing a patch of hair loss, which petitioner dates as February 25, 2024. (Ex. 6.) Citing *Christopher v. Secretary of Health & Human Services*, respondent questions the authenticity of this photo. (ECF No. 31, p. 2 (citing 2020 WL 2466601, at *4).) However, the *Christopher* case is not on point. In *Christopher*, the petitioner presented an unauthenticated screenshot

purporting to show that she entered her date of vaccination into a database. 2020 WL 2466601, at *4. However, the evidence of record also included a signed and dated vaccine administration record that provided different information. *Id*. Unremarkably, the special master gave greater weight to the contemporaneous medical record. *Id*. Here, however, the photograph at issue is dated based on its presentation within the Snapchat platform, albeit not to respondent's own satisfaction, and for the reasons discussed above, it is not contradicted by any contemporaneous medical record. Therefore, it provides some additional support for petitioner's contention that symptoms of alopecia existed after six months.

To be sure, respondent is not wrong to note that very little evidence has been presented to suggest that L.D.'s symptoms of alopecia presented beyond six months. Moreover, that evidence that does exist suggests that the ongoing sequela was fairly minimal. This could strongly suggest that even if petitioner were to prevail on vaccine-causation, damages would be incredibly low. Nor is respondent incorrect to have suggested that there is at least the appearance of some tension between the objective evidence of ongoing sequela (the photograph and December 2025 medical record) and petitioner's written statement (also from December of 2025) that "[n]ow, [L.D.]'s hair is completely thick and way healthier than before." (Ex. 4, ¶ 13.) Had this issue turned on petitioner's statement, then a fact hearing would have been appropriate at a minimum to explore that tension. Ultimately, however, petitioner has, for the reasons discussed above, presented objective evidence of at least some residua of L.D.'s condition either persisting or recurring beyond six months.

## VI. Conclusion

For the reasons discussed above, I find that the evidence preponderates in favor of a finding of fact that residual effects of L.D.'s diagnosed alopecia areata existed for more than 6 months. Accordingly, petitioner has satisfied the Vaccine Act's severity requirement at § 300aa-11(c)(1)(D).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master